UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,                              Case No. 11-CR-20178

v.                                      Hon. Stephen J. Murphy, III

MARK DAVIS,
                                        **HEARING REQUESTED**
Defendant.

_____/

### Government's Response Opposing Defendant's Emergency Motion for Compassionate Release and Recommendation for Home Confinement

Defendant Mark Davis, an associate of the Hustle Boys street gang, was sentenced to 155 months for conspiring to illegally obtain powerful prescription painkillers in the Detroit area, transport the pills to other states, and sell the pills at a substantial profit to users and dealers. Davis is not scheduled for release until April 6, 2024.  He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A), requesting the Court to order that his sentence be reduced to home confinement, or, in the alternative, for the Court to issue a recommendation that the

1

Bureau of Prisons grant him home confinement. His motion should be denied.

*First*, the Bureau of Prisons is already evaluating and releasing inmates most at risk from the COVID-19 pandemic. Following two recent directives from the Attorney General, the Bureau of Prisons is urgently assessing its entire prison population to determine which inmates face the most risk from COVID-19, pose the least danger to public safety, and can safely be granted home confinement. As of April 29, 2020, these directives have already resulted in at least 1,751 inmates being placed on home confinement, an increase of over 60 percent. *See* BOP COVID-19 Website. This process necessarily requires the Bureau of Prisons to prioritize the most pressing cases—identifying the best candidates for release, ensuring that their homes are suitable for home confinement, and arranging a way to quarantine each of them for 14 days. Davis should not be permitted to throw a wrench in that ongoing process by petitioning the Court, particularly given the absence

of any judicial authority to direct or review the Bureau of Prisons'
home-confinement decisions.

*Second*, Davis does not qualify for compassionate release. Because
defendant has not waited for the Bureau of Prisons to complete its
processing of his request, as required under 18 U.S.C. § 3582(c)(1)(A),
the Court does not have jurisdiction to address his COVID-19-based
argument until he exhausts his administrative remedies. Nor, in any
event, do Davis's characteristics qualify him for compassionate release
under that statute. He has not identified a significant medical condition
which would qualify as an extraordinary and compelling reason, and
the seriousness of the crime and his role dictate that he should continue
to serve his sentence.

## Background

On November 30, 2011, Davis, members of the Detroit-based Hustle
Boys street gang, and others were charged in a sealed second
superseding indictment with conspiring to possess with intent to
distribute and to distribute controlled substances – primarily

3

prescription pain pills such as OxyContin and Opana. At the time of the indictment, Davis was serving a three-year sentence in the Ohio Department of Rehabilitation and Correction for trafficking in drugs – an offense he committed on March 1, 2010 in furtherance of the conspiracy charged in the federal indictment. Defendant pled guilty to count one of the second superseding indictment on September 19, 2012 pursuant to a Rule 11 Agreement with the government. He was sentenced on January 29, 2013 to 155 months' imprisonment and 3 years of supervised release.

Defendant conspired to illegally obtain powerful prescription painkillers such as OxyContin, Opana, Vicodin, and Lortab in the Detroit area, transport the pills to West Virginia and southern Ohio, and sell the pills at a substantial profit to users and other dealers there. Davis began trafficking OxyContin earlier than the younger Hustle Boys members, first to Kentucky, then to southern Ohio and West Virginia, and served as a trailblazer and mentor of sorts to other

members of the conspiracy who later joined him in trafficking pills from the Detroit area to southern Ohio and West Virginia. Davis obtained pills and frequently pooled them with coconspirators, and carried them to West Virginia and southern Ohio, or arranged for pills to be transported south by others. At first, defendant and his co-conspirators based their drug distribution out of hotel rooms in the area of Huntington, West Virginia, but eventually obtained and maintained two separate residences to use when they were in the area on a sales trip. Davis and his co-defendants kept pills at the two residences and either sold pills to customers directly out of the residences or received orders from customers by telephone and then took pills from the residences to meet the customers elsewhere.

Davis admitted in the plea agreement to conspiring with others to traffic controlled substances including OxyContin, Roxicodone, Opana, Vicodin, and Lortab, and marijuana. Davis admitted to a leadership and organizer role in the conspiracy, that he and his coconspirators transported and distributed 10,000 OxyContin pills from Michigan to

Ohio and West Virginia, and that members of the drug-trafficking conspiracy foreseeably possessed firearms in connection with the conspiracy. Almost all of the firearms seized during the investigation, including three military-style assault rifles and numerous handguns, were found in the defendant's residence in Detroit, along with a bin of stolen pharmaceuticals, pounds of marijuana, and OxyContin pills. Prior to his involvement in this offense, Davis was convicted of two weapons-related offenses.

Davis began serving his prison sentence at FCI-Milan on April 16, 2014. He is 41 years old, and his projected release date is April 6, 2024. He claims to suffer from childhood asthma and severe allergies. Nevertheless, Davis has moved for compassionate release, citing his medical conditions and the COVID-19 pandemic.

Defendant's counsel submitted a letter to the Warden of FCI-Milan on April 18, 2020. Recognizing that he has not exhausted his administrative remedies, defendant requests this Court to excuse the administrative exhaustion requirement in 18 U.S.C. § 3582(c)(1)(A). He

6

alternatively requests that this Court permit Davis to complete his sentence in home confinement or urge the Bureau of Prisons to grant compassionate release.

## Argument

### I.  Federal prisoners are already being considered for home confinement during the COVID-19 pandemic, and Davis should not be permitted to cut in line over more vulnerable ones.

#### A.  The Bureau of Prisons has new authority to place federal prisoners in home confinement.

The Bureau of Prisons is already increasing the placement of federal prisoners in home confinement based on COVID-19, and its authority to do so has now been expanded. Previously, 18 U.S.C. § 3624(c)(2) authorized the Bureau of Prisons "to place a prisoner in home confinement" only "for the shorter of 10 percent of the term of imprisonment . . . or 6 months." *Id.* But new legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement." Coronavirus Aid, Relief, and Economic Security Act

7

(CARES Act), § 12003(b)(2), Pub. Law 116-136, 134 Stat 281, 516 (Mar. 27, 2020).

In addition, the Attorney General issued two directives to the Bureau of Prisons, making the finding that triggers the increased statutory authority under § 3624(c)(2) and ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic." (03-26-2020 Directive to BOP, at 1 (attached as Ex. 1); 04-03-2020 Directive to BOP, at 1 (attached as Ex. 2)). The Attorney General's directives remind the Bureau of Prisons to consider "the statutory requirements for home confinement." (03-26-2020 Directive to BOP, at 1). These statutory requirements include the requirements in 18 U.S.C. § 3624(c) and (g) for home confinement in general, as well as the requirements in 34 U.S.C. § 60541(g) for some elderly and terminally ill offenders.

The directives also require the Bureau of Prisons to identify the inmates most at risk from COVID-19 and "to consider the totality of

circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1). And the directives instruct the Bureau of Prisons to consider "*all* at-risk inmates—not only those who were previously eligible for transfer" into home confinement. (04-03-2020 Directive to BOP, at 2 (emphasis added)).

In evaluating each inmate under these new directives, the Bureau of Prisons must balance at least four general considerations: (1) the inmate's age and vulnerability to COVID-19; (2) whether home confinement would actually decrease the inmate's risk of contracting COVID-19; (3) whether the inmate is at one of the facilities most affected by COVID-19; and (4) whether the inmate's release into home confinement would risk public safety. (03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). Evaluating the inmate's risk to the public requires assessing not only the inmate's crime of conviction, but also his criminal history, the resources and security level of his prison facility,

9

his proposed home-confinement location, his disciplinary record in prison, and his risk of recidivism. (03-26-2020 Directive to BOP).

Those criteria make sense. The Bureau of Prisons cannot open its facilities' gates indiscriminately and unleash tens of thousands of prisoners, en masse, on the public at large. (04-03-2020 Directive to BOP, at 2–3). That is true in normal times, and it is particularly true given the strain on our first responders right now. As recent news reports have confirmed, a significant percentage of local law enforcement in many cities has either contracted COVID-19 or been placed under quarantine. Officers who remain on the job are stretched to their limits. Domestic violence is on the rise. Shootings and murders are increasing. *See [Detroit cops fight violence spike, social distancing violations with depleted manpower, Detroit News (Apr. 8, 2020)](.)* And innovative criminals are taking advantage of the public's desperation by perpetrating new types of crime—including COVID-19-based fraud schemes. There are real risks to public safety right now, and those risks will only increase if communities are faced with a sudden influx of

prison inmates. That is just one reason, among many, why the Bureau of Prisons must focus on releasing inmates who are the most vulnerable to COVID-19 and whose release will least endanger public safety.

Another reason is the dilemma that everyone will face if an incorrigible inmate is granted home confinement and then either violates his home-confinement conditions or commits additional crimes. The home-confinement statutes permit—and in some instances, require—the Bureau of Prisons to revoke home confinement and re-incarcerate an inmate if he reoffends. 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). This means that if an inmate is released and then commits a serious crime, the Bureau of Prisons and the justice system will face a difficult choice: either (i) violate the statute, permit the inmate to remain free, and give him de facto authorization to continue harming the public as much as he pleases, or (ii) return the inmate to custody and risk him bringing COVID-19 back into the prison system, placing other inmates at risk. That is all the more reason to get the initial release decision right, and it is why the Bureau of Prisons must

11

carefully consider whether an inmate should be granted home

confinement.

> ### B.   Even if Davis is eligible for home confinement, he should not be permitted to cut in front of other inmates for consideration by the Bureau of Prisons.

Davis might or might not be granted home confinement under the

new legislation and Attorney General's directives. But either way, he

should not be permitted to push his way in the queue past other

inmates who are less dangerous and more vulnerable than he is. At age

41, Davis is not elderly, and he is therefore not at higher risk from

COVID-19 because of his age. Although the Center for Disease Control

and Prevention initially indicated that those with moderate to severe

asthma may be at a higher risk, other studies have recognized that may

not be the case, and in any event, defendant has only stated a childhood

asthma concern. *See People Who Are At Higher Risk, Ctrs. For Disease*

*Control and Prevention* (Apr. 2, 2020)

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

precautions/asthma.html; *Asthma Is Absent Among Top Covid-19 Risk*

*Factors, Early Data Shows*,

https://www.nytimes.com/2020/04/16/health/coronavirus-

asthmarisk.html. And even assuming Davis's childhood asthma and

allergies increase his risk, there are undoubtedly other inmates whose

medical conditions are more serious and who are more at risk from

COVID-19—and whose evaluation and potential release should take

priority over Davis. Defendant should not be permitted to cut in front of

those other, more vulnerable inmates.

Davis downplays his record and criminal history, which the Bureau

of Prisons must weigh here. Defendant was already serving time in

Ohio when he was indicted on the current offense. Moreover, he fails to

point out the significant number and type of firearms that were

involved in the crime for which he is serving time, and the danger that

such characteristics represent to the community. It is also concerning

that he references a girlfriend in Georgia who apparently will be

responsible for his continued rehabilitation if he is released. It is at

least questionable whether Davis would cease engaging in serious criminal conduct.

Given Davis's record, it is also questionable whether he would abide by the terms of home confinement—much less adhere to the CDC's social-distancing protocols or the Governor's stay-at-home order. Davis has previously shown an unwillingness to follow even far more basic societal norms. Because Davis would be unlikely to remain in home confinement or take those COVID-19 restrictions seriously, he would also be far more likely than other members of the public to contract COVID-19—perhaps even more likely than he would be in prison—and would also be more likely to spread it to other people. But again, that risk to the public, whatever it may be, is one of the factors that the Bureau of Prisons must evaluate in determining whether Davis should be granted home confinement.

Further, even if the Bureau of Prisons were inclined to release Davis into home confinement, it must first ensure that any home-confinement location is suitable for release, does not place him at an even greater

14

risk of contracting COVID-19, and does not place members of the public at risk from him. (03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). Although the Bureau of Prisons is expediting that process— particularly at the facilities most affected by COVID-19—it cannot happen overnight; nor can it handle every potentially eligible inmate simultaneously. The Bureau of Prisons should therefore be permitted to prioritize the inmates who are least dangerous to the public and most vulnerable to COVID-19. And Davis should not be permitted to interfere with that process just by petitioning the Court. *See Wolff v. McDonnell*, 418 U.S. 539, 566 (1974) (cautioning that courts "should not be too ready to exercise oversight and put aside the judgment of prison administrators").

The Bureau of Prisons is also working around the clock to protect any inmates who are not eligible for discretionary release. Inmates at every institution, including FCI-Milan, are being protected by a new shelter-in-place protocol to decrease the spread of the virus. Even prior

to the national lockdown, the Bureau of Prisons had already instituted a number of precautionary measures to reduce the risk of infection..

As of April 23, 2020, FCI Milan has identified 57 inmates, of the total 1450 inmates, who have tested positive for COVID-19; 26 of those inmates have recovered and 2 have died. Forty-eight staff members at FCI Milan have also tested positive. However, in order to prevent the spread of the virus, on March 31, 2020, the Director of the Bureau of Prisons ordered the implementation of Phase 5 of its COVID-19 Action Plan, effective April 1, 2020, which included a measure that for a 14-day period, inmates in every BOP institution would be secured in their assigned cells/quarters to decrease the spread of the virus (i.e. "stay in shelter"). Then, on April 13, 2020, the Director of BOP ordered the implementation of Phase 6 of its COVID-19 Action Plan. Plan 6 extends all measures of Phase 5 until May 18, 2020. As part of implementing BOP's "stay in shelter" order (a provision of Phase 5 which continues into Phase 6), both the Milan FDC and FCI took steps to maximize social distancing and limit group gatherings, including

16

staggering "out of cell" times. In addition, officials at Milan have instituted a number of precautionary measures to reduce the risk of infection. These include the following:

- *Detainees Entering the Facility and Current Detainees.* The BOP manages an infectious disease management program as a matter of course, but in order to address the specific COVID-19 pandemic, BOP facilities, including Milan, have instituted additional measures, including: (i) all newly-arriving detainees and BOP inmates are screened for COVID-19 exposure risk factors and symptoms; (ii) all newly-arriving detainees/inmates are isolated in quarantine for 14 days as a matter of course, regardless of whether they display any symptoms or exposure risk factors; (iii) asymptomatic detainees/inmates with exposure risk factors are quarantined; and (iv) symptomatic detainees/inmates with exposure risk factors are isolated until medically cleared consistent with current guidelines.

- *Onsite Medical Care.* FCI Milan's Health Services department is currently accredited by the Accreditation Association for Ambulatory Healthcare (AAHC).

- *Visitation.* The facility has suspended in-person social visits and attorney visits for 30 days (starting on March 14, 2020) now through May 18, 2020 as a result of Phase 6 of the COVID-19 Action Plan, at which point the suspension will be reevaluated. (Exceptions for in-person attorney visits may be made by the facility, at the request of a defense attorney; however, none have been approved to date.)

- *Sanitation.* Sanitation efforts have increased at the facility, with extra emphasis on high traffic areas. Inmates have always had,

17

and continue to have, access to disinfectant for use in their cell. In addition, educational medical literature regarding hand-washing and other sanitation measures is displayed for detainees/inmates.

- *Correctional Officers and Staff.*  All staff are currently screened daily at the facility, including having their temperature taken. Staff have been advised that they must self-report any symptoms.

- *Other.* Operations and programs for detainees and inmates have been modified to assist with social-distancing efforts, including staggered meal and recreation times.

On April 14, 2020, BOP counsel, Tracy Knutson, also confirmed that these additional specific safety conditions were implemented specifically at FCI Milan and for those who may be at a higher risk:

- The FCI emptied out a unit (cell-type style), sanitized the unit, and started moving the most at-risk inmates (per CDC guidelines) to that unit on 4/15/2020. The goal is to locate those inmates out of the open bay housing units where social distancing is more difficult.

-  As of April 10, 2020, every detainee/inmate housed at Milan FDC and FCI had received a mask. Soon, all FCI inmates will be issued three face coverings.

- Regarding staff members:

  o PPE is worn by staff when in contact with quarantined or isolated inmates.

  o PPE is worn by staff who are serving meals.

18

     o  Other staff have been issued face coverings to use when social distancing cannot be achieved.

     o  Every employee has been issued 3 face coverings for use.

In any event, there is no jurisdiction for the Court to order home confinement or to review the Bureau of Prisons' decisions on which inmates are, or are not, granted home confinement. Neither § 3624(c) nor § 60541(g) contains any provision for judicial review. To the extent Davis asks this Court to order his release into home confinement, his motion must be dismissed for lack of jurisdiction.  *See, e.g.*, *United States v. McCann*, 2020 WL 1901089 (E.D. Ky. Apr. 17, 2020); *Miller v. United States*, 2020 U.S. Dist. LEXIS 62421, at *4-5 (E.D. Mich. Apr. 9, 2020); *United States v. Garza*, 2020 WL 1485782 (S.D. Cal. Mar. 27, 2020) (recognizing that "the Court lacks authority to designate home confinement"); *United States v. Brown*, 2020 WL 1479129, at *1 (D. Md. Mar. 26, 2020) ("It is inherently the authority of the Bureau of Prisons to transfer an inmate to home confinement, pursuant to 18 U.S.C. § 3624(c)."); *see also United States v. Patino*, No. 18- 20451, 2020 WL

1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons.").

That is especially true here, because Davis is seeking release from this Court *before* permitting the Bureau of Prisons to evaluate whether he is a good candidate for home confinement. Even in other contexts, when limited judicial review of prison administration is appropriate, inmates are required to exhaust their administrative remedies before challenging "events or conditions relating to their custody." *Little v. Hopkins*, 638 F.2d 953, 953 (6th Cir. 1981). There is no basis for Davis to preempt that administrative process here—particularly given that judicial review of any home confinement decisions is not permitted at all. Davis, in short, is asking for relief in the wrong forum.

## C. The Court should decline Davis's request for a recommendation that he be granted home confinement.

The Court should also deny Davis's request for a judicial recommendation to the Bureau of Prisons that he finish his sentence under home confinement. Even assuming the Court has the authority to

grant such a recommendation, Davis is not a strong candidate for it. Davis has a long history with firearms, and still has several years to serve on his sentence. Davis has shown that he is capable of assuming a significant leadership role in running a criminal organization. He would not be a good candidate for home confinement because of the significant risk that without proper supervision and direction, he could return to his previous criminal devices.

## II.    The Court should deny Davis's motion for compassionate release.

Section 603(b) of the First Step Act of 2018 amended 18 U.S.C. § 3582 to afford inmates the right to seek compassionate release on their own motion, when previously only the Bureau of Prisons' Director could do so. But first, inmates must request compassionate release and exhaust their administrative remedies with the Bureau of Prisons, or wait 30 days in the event the Bureau of Prisons fails to act on their request. 18 U.S.C. § 3582(c)(1)(A). Second, a court may only grant compassionate release based on an individual inmate's "extraordinary and compelling reasons," which must be consistent with the Sentencing

Commission's policy statement and which the inmate has the burden of showing. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13(1)(A), (3); *United States v. Hamilton*, 715 F.3d 328, 327 (11th Cir. 2013). And third, a court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that the inmate "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2).

### A. The Court is barred from granting release because Davis has not exhausted his administrative remedies.

The Court must dismiss Davis's motion because he has not satisfied the exhaustion requirement for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Before an inmate moves for compassionate release in court, he "must at least ask the Bureau of Prisons[] to do so on [his] behalf and give BOP thirty days to respond." *United States v. Raia*, __ F.3d __, No. 20-1033, at 3 (3d Cir. Apr. 2, 2020) (citing § 3582(c)(1)(A)) (opinion amended on Apr. 8, 2020).

Statutory exhaustion requirements, like the one in § 3582(c)(1)(A), are mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1855–57 (2016). Those requirements may not be excused, even to account for "special

circumstances." *Id.* Rather, as a judge in this district recently held,

"[t]he text of 18 U.S.C. § 3582(c) defines mandatory conditions

precedent to a defendant filing a motion [for compassionate release]

under that section." *United States v. Alam*, No. 15-20351, at 4 (E.D.

Mich. Apr. 8, 2020);

Davis did not exhaust his administrative remedies. Although Davis's

counsel submitted the request to the Warden on April 18, he has not

waited the requisite 30-day period for the Bureau of Prisons to respond.

Davis has therefore not satisfied § 3582(c)(1)(A)'s mandatory exhaustion

requirement.

That failure is fatal to Davis's claim. As the Third Circuit held

recently in denying a similar, unexhausted motion for compassionate

release, the COVID-19 pandemic does not permit inmates or district

judges to bypass § 3582(c)(1)(A)'s exhaustion requirement. *United*

*States v. Raia*, __ F.3d __, No. 20-1033, at 8 (3d Cir. Apr. 8, 2020)

(opinion amended on Apr. 8, 2020). Rather, "[g]iven BOP's shared desire

for a safe and healthy prison environment, . . . strict compliance with

23

§ 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Id.*; *see also United States v. Rabadi*, 2020 WL 1862640, at *3 (S.D.N.Y. Apr. 14, 2020) (collecting numerous cases in which "courts have regularly held that statutory exhaustion requirements, such as those in Section 3582(c), must be 'strictly' enforced"); *United States v. Epstein*, 2020 WL 1808616, *4 (D.N.J. Apr. 9, 2020) (collecting cases and stating that "a majority of district courts across the country" have held that the Court does not have the authority to excuse a defendant's failure to exhaust his administrative remedies); *United States v. Alam*, No. 15-20351, at 6 (E.D. Mich. Apr. 8, 2020) ("[T]his failure to exhaust cannot be excused, even in light of the COVID-19 pandemic."); *United States v. Hofmeister,* 2020 WL 1811365, at *3 (E.D. Ky. Apr. 9, 2020) (rule is jurisdictional, and perhaps even more necessary during COVID-19 crisis); *United States v. Johnson*, 2020 WL 1663360, at *3-6 (D. Md. Apr. 3, 2020) (concluding in lengthy discussion that § 3582(c)(1)(A)'s exhaustion requirement is jurisdictional and, regardless, there are no

24

exceptions to the exhaustion requirement). Davis's motion must be denied on that basis alone.

### B. There are no extraordinary and compelling reasons to grant Davis compassionate release.

Even if Davis had exhausted his administrative remedies, compassionate release would be improper. The First Step Act did not change the substantive requirement that compassionate release be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A); *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *3 (10th Cir. Mar. 26, 2020). Nor did Congress remove the directive that the Commission, not the judiciary, adopt the policies regarding "what should be considered extraordinary and compelling reasons for sentence reduction." 28 U.S.C. § 994(a)(2)(C) & (t).

In that sense, the compassionate-release standard mirrors the identically-worded standard for sentence reductions under 18 U.S.C. § 3582(c)(2) based on retroactive guideline amendments. In both contexts, the Sentencing Commission's policy statements place "hard

25

limit[s] on a court's ability to reduce the sentence." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). And the Supreme Court has upheld those limits under § 3582(c)(2), stressing that "Congress charged the Commission with determining in what circumstances and by what amount the sentences of prisoners affected by Guidelines amendments may be reduced." *Dillon v. United States*, 560 U.S. 817, 830 (2010). Even when an inmate asks a district court to disregard those limits, the Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *Jackson*, 751 F.3d at 711; *accord United States v. Horn*, 612 F.3d 524, 527–28 (6th Cir. 2010).

For compassionate release, the Sentencing Commission has fulfilled Congress's directive in its policy statement in USSG § 1B1.13. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons." USSG § 1B1.13 cmt. n.1. Unless an inmate's circumstances fall within those categories,

26

he is not eligible for compassionate release. 18 U.S.C. § 3582(c)(1)(A); *Saldana*, 2020 WL 1486892, at \*3; *cf. Dillon*, 560 U.S. at 830.

Davis relies on his childhood asthma and allergies, but he is not eligible for compassionate release on this basis, as those conditions do not fit within the kinds of grave, end-of-life medical conditions contemplated by Congress. *See, e.g.*, *United States v. Resnick*, 2020 WL 1651508, at \*7 (S.D.N.Y. Apr. 2, 2020) (defendant is 65 years old, and has diabetes and end-stage liver disease, making him vulnerable to COVID-19); *United States v. Rodriguez*, 2020 WL 1627331, at \*7 (E.D. Pa. Apr. 1, 2020) (release granted where defendant is vulnerable due to Type 2 diabetes mellitus with diabetic neuropathy, essential hypertension, obesity, and "abnormal liver enzymes in a pattern most consistent with non-alcoholic fatty liver disease," has only one year left on 20-year sentence, and has exhibited good behavior). The other categories do not apply to Davis.

Nor is Davis correct in suggesting that the COVID-19 pandemic should alter this analysis here. A recent New York Times article

concluded that despite widespread belief that asthma is one of the high-risk categories, it is not even in the top 10. *Asthma Is Absent Among Top Covid-19 Risk Factors, Early Data Shows*, https://www.nytimes.com/2020/04/16/health/coronavirus-asthmarisk.html. During a medical exam in in August 2019, Davis, in fact, denied having allergies. *See Ex. 3, Defendant's Medical Records 2019* (filed under seal). He also indicated that although he suffered from asthma as a child, he grew out of it. (*Id*.). Davis is 41, and appears to have no other health conditions other than childhood asthma and allergies. He certainly does not have the kinds of medical conditions for which other inmates have been granted compassionate release in light of the COVID-19 pandemic. *See, e.g.*, *Samy v. United States*, 2020 WL 1888842 (E.D. Mich. Apr. 16, 2020) (72 years old, 12 serious ailments, including uncontrolled hypertension, congestive heart failure, type II diabetes, and asthma); *United States v. Burrill*, 2020 WL 1846788 (N.D. Cal. Apr. 10, 2020) (defendant has served about half of 30-month sentence for investment adviser fraud; he "is 75 years old and suffers

28

from asthma, high blood pressure, high cholesterol, diabetes, diverticulosis, blood clots, hearing loss, glaucoma, cataracts, and lower back nerve pain."); *United States v. McCarthy*, 2020 WL 1698732 (D. Conn. Apr. 8, 2020) (defendant has 26 days remaining on sentence; "is 65 years old and suffers from a host of medical ailments, including chronic obstructive pulmonary disease ("COPD") and asthma").

Rather, the crux of Davis's claim is a generalized assertion that he *could* contract COVID-19 and that the virus *could* jeopardize his health, and that the risk of those things happening in prison is greater than the risk of them happening on release. But Davis sidesteps an important consideration in that analysis: the likelihood that he would *still* contract COVID-19, even if released. COVID-19 is—and will continue to be— widespread among the public for many months. Davis's prior conduct also shows that he would be unlikely to follow even basic restrictions on release, much less the CDC's social-distancing protocols or the Governor's stay-at-home order. Given this reality, it is hardly clear that Davis faces a greater risk in prison than he would if released. And in

29

any event, Davis's speculation on this point is not enough to satisfy

§ 1B1.13's criteria.

Nor is Davis eligible for compassionate release based on the "other

reasons" category. For this category, the Bureau of Prisons has issued

[Program Statement 5050.50](), which contains standards for eligibility

that are related to but somewhat more extensive than the first three

categories. Davis has not shown that he satisfies those standards.

Further, because Congress and the Sentencing Commission have

mandated that "other reasons" for eligibility be determined by the

Bureau of Prisons, not the judiciary, the Court lacks the authority to

grant compassionate release based solely on the general threat posed by

the COVID-19 pandemic. *See United States v. Saldana*, No. 19-7057,

2020 WL 1486892, at *3 (10th Cir. Mar. 26, 2020); *United States v.

Lynn*, 2019 WL 3805349, at *4-5 (S.D. Ala. Aug. 13, 2019); *United

States v. Shields*, 2019 WL 2359231, at *4 (N.D. Cal. June 4, 2019) .

Even if that judicial authority existed, the COVID-19 pandemic does

not qualify as the type of inmate-specific reason permitting

compassionate release. As the Third Circuit explained, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, __ F.3d __, No. 20-1033, at 8. The Bureau of Prisons has worked around the clock to implement precautionary measures reducing the risk from COVID-19 to Davis and other inmates. And if COVID-19, standing alone, qualified as an "extraordinary and compelling reason[]" for relief, there would be no limiting principle: *every* inmate—no matter his actual risk of contracting COVID-19 in prison, no matter his risk of contracting COVID-19 if released, and no matter his risk of developing complications from COVID-19, either in prison or on release—would be presumptively entitled to relief under § 3582(c)(1)(A). Nothing in the statute or USSG § 1B1.13 supports such an unbounded interpretation. *See Raia*, __ F.3d __, No. 20-1033, at 8. Davis is not eligible for compassionate release.

31

## C.    The factors set forth in 18 U.S.C. § 3553(a) also do not support relief.

Even when an inmate is statutorily eligible for a sentence modification based on an "extraordinary and compelling reason," compassionate release is not necessarily appropriate. Before ordering relief, courts must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that the inmate "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). Even if the Court were to find Davis eligible for compassionate release, the § 3553(a) factors and § 1B1.13(2) should still disqualify him. The defendant's involvement in the current offense was significant. The offense was very serious and posed a grave danger to the community. The defendant himself was not a bit player: he was a leader and trailblazer for his conspirators. Davis moved a significant amount of lethal drugs between Michigan and Ohio, and he possessed a number of weapons to facility this conspiracy. He also had prior felony convictions, which did not deter him from engaging in this significant and dangerous conduct.

32

## Conclusion

For the reasons stated above, defendant's emergency motion for release should be denied. If the Court were inclined to grant Davis's motion, despite the government's arguments above, the government would request that the Court's release order include two provisions. First, the Court should order that Davis be subjected to an additional 14-day quarantine before release. Second, the Court should stay its order pending any appeal by the government to the Sixth Circuit. More specifically, the government would request that if the government files a notice of appeal before the 14-day quarantine ends, the Court's order would automatically be stayed through the completion of any appeal proceedings.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

*s/Mark Chasteen*
Mark Chasteen
Assistant United States Attorney
211 W. Fort St., Suite 2001
Detroit, MI  48226

33

(313) 226-9555
Mark.chasteen@usdoj.gov

Dated: April 30, 2020

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 30, 2020, I electronically filed the foregoing document with the Clerk of the Court of the Eastern District of Michigan using the ECF system which will send notification of such filing to the following:

Wade Fink
Attorney for the Defendant

*s/Mark Chasteen*
Mark Chasteen
Assistant United States Attorney

35